UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
CLAUDIA BILDIRICI, on behalf of minor child,
LOTTIE BILDIRICI,

                              Plaintiff,          Affirmation of Attorney in Reply
                                                  to an Order to Show Cause

          -against-                               08 Civ. 3769 (LAK)

NEW YORK CITY DEPARTMENT OF EDUCATION,

                              Defendant.
----------------------------------------------------------------X


AFFIRMATION OF ANTON PAPAKHIN

1.      Anton Papakhin, an attorney duly licensed to practice law before this Court, affirms under

the penalty of perjury that the following is true and correct:

That I am associated with the attorneys for the plaintiff herein and am familiar with the facts and

circumstances herein, except as to those alleged upon information and belief, and as to those I

verily believe them to be true.

2.      That I make this Affirmation in Reply to this Honorable Court's instant Order to Show

Cause why an order should not be entered requiring that the complaint and the caption be amended

so as to set forth the names of all the parties in accordance with Fed. R. Civ. P. 10(a).

3.      On May 5, 2008, in the interests of judicial economy and in accordance with this Court's

prior decision in, S.R. and M.C. on behalf of M.C., et al v. Board of Education of the City School

District of the City of New York, 49 IDELP 255, 108 LRP 14976, (SDNY 2008), the office of the

undersigned has filed with this court an Amended Complaint setting forth names of all the parties in

accordance with Fed. R. Civ. P. 10(a).  True and accurate copy of the Amended Complaint attached hereto as **Exhibit "A."**

Dated: Brooklyn, New York
       May 6, 2008

                      Respectfully submitted,

                      _____

                      Tikhomirov & Roytblat, PLLC
                      By: Anton Papakhin (AP 4680)
                      Attorney for Plaintiffs
                      1400 Avenue Z– Suite 403
                      Brooklyn, NY  11235
                      Tel:(718) 376-9500
                            (917) 270-1403
                      Fax:(718) 676-5649

### *CERTIFICATE OF SERVICE*

      I, the undersigned attorney of record for the Plaintiff in the above referenced cause, do hereby certify that I have this day served a true and complete copy of the foregoing Affirmation in Reply to Order to Show Cause by first class mail, postage pre-paid, upon the following:

CORPORATION COUNSEL
OF THE CITY OF NEW YORK
100 CHURCH STREET
NEW YORK, NEW YORK 10007

Certified this the 6th day of May, 2008.

                              _____
                              Anton Papakhin (AP 4680)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                       :

CLAUDIA BILDIRICI, on behalf of minor child,  :
LOTTIE BILDIRICI,
                                       :        Docket No.

                      **Plaintiffs,**    :

                                       :        **08 -CV-3967**

       -against-                 :

                                       :        **AMENDED**

THE BOARD OF EDUCATION OF THE      :        **COMPLAINT**
CITY SCHOOL DISTRICT OF THE        :
CITY OF NEW YORK (d/b/a The Department  :
of Education of the City School District of   :
the City of New York)                   :

                       **Defendant(s).**   :

                                       :
------------------------------------------------------------ X

1.  This is an action to recover attorney's fees and costs incurred in the course of administrative proceedings brought pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1415 *et seq.*

2.  Plaintiff is the biological parent of Lottie Bildirici, a child with a disability as defined by the IDEA.

3.  The Board of Education of the City School District of the City of New York ("Defendant"), which now identifies itself as the New York City Department of Education, was, at all times relevant to this action, responsible for providing Lottie Bildirici with a free, appropriate, public education ("FAPE") pursuant to 20 USC §1400(d)(1)(A).

4.  Defendant's principal administrative offices are located at 52 Chambers Street, New York, New York 10007.

**JURISDICTION AND VENUE**

5.  This Court has jurisdiction over Plaintiff's federal claims pursuant to 20 U.S.C. §1415 (i)(3)(A), as an action for an award of reasonable attorneys' fees and costs to prevailing parties in administrative proceedings under the IDEA; and under 28 U.S.C. §1331 as an action raising a federal question.

6.  Venue is properly laid in the United States District Court for the Southern District of New York, as authorized by 28 U.S.C. §1391(b)(1), because a substantial part of the events giving rise to Plaintiff's claims occurred in this Judicial District, and because the DOE performs its official duties and has its principal offices in this Judicial District.

**PARTIES**

7.  Defendant is organized pursuant to the New York State Education Law and the regulations of the New York State Commissioner of Education.

8.  Defendant is a "local educational agency" as that term is defined by 20 U.S.C. §1401(8) and receives federal funding as such.

9.  Defendant is responsible for, among other things, the establishment and implementation of special education programs for students with disabilities residing in New York City in accordance with the IDEA, Article 89 of the New York Education Law ("Article 89"), and their respective implementing regulations.  Defendant DOE is also mandated by IDEA and Article 89 to identify all children with disabilities residing within New York City, and to provide each such child with a free appropriate public education ("FAPE").

10. Plaintiff Claudia Bildirici is the parent of Lottie Bildirici, a student with a disability. They reside together in the State of New York, City of New York, County of Kings, located within Defendant's jurisdiction.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. Plaintiff has exhausted administrative remedies under New York Education Law and the IDEA.

12. Plaintiff requested an impartial hearing in accordance with 20 U.S.C. § 1415 and N.Y. Education Law §4404 on September 17, 2004, to dispute the appropriateness of the public school placement recommended by Defendant, and to obtain tuition reimbursement for the private special education program chosen by Plaintiff after determining that no appropriate public school placement was available.

13. The impartial hearing was conducted on June 28, 2005, July 18, 2005, and September 8, 2005. The impartial hearing officer, Diane Cohen, Esq. ("IHO"), issued a decision dated November 13, 2005. The IHO denied Plaintiff's request for tuition reimbursement on the basis that Plaintiff lacked standing to bring a claim for tuition reimbursement, citing to *Board of Education of the City School District of the City of New York v. Tom F. ex rel Gilbert F.*, WL 22866 (S.D.N.Y. January 4, 2005), *vacated and remanded* by 193 Fed. Appx. 26 (2nd Cir. Aug 09, 2006), *certiorari granted*, 127 S.Ct. 1393, 167 L.Ed.2d 158, (U.S. Feb 26, 2007), and that the public placement was appropriate to meet Lottie's special education needs.

14. Ultimately, the Supreme Court was equally divided in its decision, with Justice Anthony M. Kennedy taking no part in the decision, and, as a result, the Second Circuit's decision vacating the Southern District became precedent. As a result, the IHO's decision in the instant matter was in contradistinction with established precedent.

15. Plaintiff timely appealed the decision of the IHO to the Office of State Review, New York State Education Department, on December 12, 2005. The State Review Officer (SRO), Paul F. Kelly, rendered a decision dated March 1, 2006, sustaining Plaintiff's appeal and

awarding all of the relief requested in the petition. *See, Application of a Child with a Disability,* Appeal No. 05-125, attached hereto as Exhibit "A".

16. Defendant did not appeal the SRO's decision and, therefore, the decision became final and binding upon the parties.

## BASIS OF CLAIM

17. Plaintiff was a prevailing party at the administrative proceeding. As the prevailing party, Plaintiff is entitled to reasonable attorney's fees and costs pursuant to 20 U.S.C. §1415(i)(3)(B).

18. Plaintiff was represented at the impartial hearing by Joan Harrington, a parent advocate and founder of Educational Advocacy Services, Inc. During the hearing, Plaintiff retained the law firm Shebitz Berman Cohen & Delforte, P.C., as special counsel, to assist Ms. Harrington during the course of the proceedings.

19. Plaintiff retained Anton Papakhin, Esq. to appeal the decision of the IHO to the SRO. Plaintiff won the appeal to the SRO, and Defendant did not take further appeal.

20. Subsequent to the SRO's decision, Plaintiff's attorneys, at Defendant's request, submitted time logs detailing all attorney-time spent. The fee application from Anton Papakhin, Esq. reflected a total of 132.5 hours billed at an hourly rate of $275.00, for a total of $36,437.50.

21. The time log submitted by Shebitz Berman Cohen & Delforte, P.C. totaled 40.25 hours billed at an hourly rate of $350.00, for a total of $13,859.98 in fees and costs. Notably, Shebitz Berman Cohen & Delforte, P.C., as a courtesy to Plaintiff, did not bill an addition 9.33 hours of time, which amounted to $3,113.50, despite its right to do so.

22. Since submitting its original time logs, Shebitz Berman Cohen & Delforte, P.C. billed an additional 9.25 hours of time in connection with its efforts to recover its fees from

4

Defendants. Thus, the total amount to date expended by Shebitz Berman Cohen & Delforte, P.C. equals $17,099.91.

23. The hours expended by the attorneys in connection with the Impartial Hearing and the appeal to the Office of State Review were reasonable in relation to services required and performed.

24. The fees billed by Plaintiff's attorneys were based on prevailing hourly rates in the community for similar services provided by attorneys with comparable professional experience.

25. Plaintiff's attorneys have made extensive efforts to resolve this dispute without resort to commencing this federal court action. Plaintiff's attorneys resorted to filing this action only after Defendant failed or refused repeatedly to respond to Plaintiff's attorneys' numerous calls and writings regarding reimbursement of Plaintiff's attorneys' fees and costs.

### AS AND FOR A FIRST CAUSE OF ACTION

26. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 25 as if fully set forth anew herein.

27. As a result of the foregoing, under 20 USC §1453(i), Plaintiff is entitled to attorneys' fees and costs in the amount of $53,537.41 relating to the impartial hearing, SRO appeal, and efforts to collect attorneys' fees.

28. Defendants failure to reimburse Plaintiff for attorneys' fees and costs incurred to secure a FAPE for their child is a violation of 20 USC §1453(i).

29. In addition, under 20 USC §1453(i), Plaintiff is entitled to attorneys' fees, costs and disbursements incurred in pursuing this action.

WHEREFORE, Plaintiff demands the following relief:

a.  Reasonable attorneys' fees, costs and disbursements in the amount of $53,537.41,

which represents $36,437.50 for Anton Papakhin's fees and disbursements and

$17,099.01 for Shebitz Berman Cohen & Delforte's fees and disbursements, plus

statutory interest;

b.  Any additional reasonable attorneys' fees, costs and disbursements incurred to

maintain this action; and

c.  Such further and other relief as this Court deems just and proper.

Dated:  Brooklyn, New York
        May 5, 2008

                                Respectfully submitted,

                                _____

                                Tikhomirov & Roytblat, PLLC
                                By: Anton Papakhin (AP 4680)
                                Attorney for Plaintiffs
                                1400 Avenue Z– Suite 403
                                Brooklyn, NY  11235
                                Tel.:  (718) 376-9500
                                       (917) 270-1403
                                FAX :(718) 676-5649

# EXHIBIT A



# The University of the State of New York

## The State Education Department
### State Review Officer

No. 05-125

**Application of a CHILD WITH A DISABILITY, by her parent, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

Educational Advocacy Service, attorney for petitioner, Anton Papakhin, Esq., of counsel

Hon. Michael A. Cardozo, Corporation Counsel, attorney for respondent, Huria S. Naviwala, of counsel

## DECISION

    Petitioner appeals from the decision of an impartial hearing officer which denied her request to be reimbursed for her daughter's tuition costs at the Manhattan Day School (MDS) for the 2004-05 school year. The appeal must be sustained.

    Petitioner's daughter was 11 years old and had completed the fifth grade at MDS at the commencement of the impartial hearing in June 2005 (Tr. p. 121; Dist. Ex. 5; Parent Ex. D). During that school year, the student had been enrolled in a mainstream class at MDS, where she had been unilaterally placed by petitioner for the 2004-05 school year (Tr. pp. 82, 120). At the time of the unilateral placement, MDS had not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities (8 NYCRR 200.7). The school had provided the student with 1:1 support from a teacher in the school's special education department for at least an hour each day (see Tr. pp. 121, 140, 164-65, 166-67) and she had also received speech-language therapy at MDS from respondent under a related services agreement (see Dist. Ex. 3). The student's eligibility for special education programs and services and classification as a student with a learning disability (see 8 NYCRR 200.1[zz][6]) are not in dispute in this appeal.

    Petitioner first referred her daughter to respondent's Committee on Special Education (CSE) in May 2000 (Tr. p. 9). Respondent's CSE classified petitioner's daughter as a student with a learning

disability in August 2000 prior to her beginning first grade for the 2000-01 school year (Tr. pp. 9, 83). The student had attended a non-public kindergarten and then attended MDS for first, second, third, and fourth grades (Tr. pp. 9, 83-85). The student's August 2000 individualized education program (IEP), which was for the first grade, recommended general education with part-time special education teacher support (Tr. p. 9). The student's IEPs for grades two, three, and four recommended special classes with counseling and speech-language therapy (Tr. p. 9). As a result of agreements with petitioner, respondent has reimbursed petitioner for the student's tuition costs at MDS since she began attending that school (Tr. pp. 84-85).

  At petitioner's request, a private psychoeducational evaluation was conducted by a clinical psychologist during September and October 2002, when the student was in the third grade (Dist. Ex. 10). The evaluator described the student as having an underlying language processing deficit and a deficit in the visual-perceptual-motor area (Dist. Ex. 10 at p. 9; see also Dist. Ex. 10 at pp. 2, 3, 6, 7). The evaluator noted that the student had "prospered" and made "significant progress" at MDS and that "her scores on many tasks are significantly higher than they were in (the evaluator's) earlier evaluation" (Dist. Ex. 10 at pp. 2, 9). Administration of the Wechsler Intelligence Scale for Children-Third Edition (WISC-III) at that time yielded a verbal IQ score of 93, a performance IQ score of 98, and a full scale IQ score of 95, all in the average range (Dist. Ex. 10 at pp. 2, 5, 9). The private evaluator also administered the Woodcock-Johnson III Tests of Achievement (W-J-III) (Dist. Ex. 10 at p. 4). The student's performance yielded the following results: 21st percentile with a 2.3 grade equivalent on the letter word identification subtest; 33rd percentile with a 2.6 grade equivalent on the passage comprehension subtest; 2.0 grade equivalent on the spelling subtest (percentile information was not provided); 79th percentile with a 4.4 grade equivalent on the writing samples subtest; 33rd percentile with a grade equivalent of 2.8 on the calculation subtest; and 78th percentile with a grade equivalent of 4.0 for applied problems. The evaluator advised that the student's "clear learning disability will continue to make learning difficult, especially as tasks become more complex and require more language processing, more complex integration of visual-perceptual-motor functioning and as the requirements for more sustained, independent work increase" (Dist. Ex. 10 at p. 8). The evaluator indicated that "no emotional pathology was seen" in her evaluation of the student's personality, but that the student's self esteem related to her academics was poor and contributed to a passive-dependent learning style (Dist. Ex. 10 at p. 9). The private evaluator concluded that the student continued to require a special education setting and that the student would be "lost in a mainstream class without specially trained teachers available to monitor her needs, remediate her weakness, and individualize lessons for her success" (id.). However, she also recommended, "mainstreaming wherever possible," that the student "be encouraged to pursue activities in the areas of her strength (sports)," and "have as many positive social experiences as possible" (id.). The evaluator further recommended a reevaluation in two years (id.).

  Respondent conducted an educational evaluation of the student in December 2002 (Dist. Ex. 9 at p. 1). That evaluator also administered the W-J-III. The results of that testing indicated that the student performed at the 40th percentile with a 3.0 grade equivalent for letter-word identification and at the 34th percentile with a grade equivalent of 2.6 on the passage comprehension subtest. Results of the spelling subtest indicated that the student performed at the 28th percentile with a grade equivalent of 2.6 and results of the writing samples subtest was at the 66th percentile with a 4.0 grade equivalent. Results of the calculation subtest indicated that the student performed at the 42nd percentile with a grade equivalent of 2.9. Results of the applied problems subtest indicated that the student performed at the 29th percentile with a grade equivalent of 2.3 (Dist. Ex. 9 at p. 1).

Respondent conducted a psychological evaluation of the student in January 2003 (Dist. Ex. 8). The evaluator also administered the WISC-III to the student (id.). This administration of the WISC-III yielded a verbal IQ score of 102, a performance IQ score of 82, and a full scale IQ score of 92 (Dist. Ex. 8 at p. 2). The record does not indicate that respondent was aware at the time of this testing that the student had taken the same test less than four months earlier.

In January 2004, respondent's school social worker contacted petitioner by telephone and "made her aware" that "respondent's team" had determined that it did not need to re-test the student and, if there were anything that petitioner believed that she needed to add, that petitioner should contact her (Tr. pp. 10-11, 12; see also Dist. Ex. 2).

On February 9, 2004, the CSE met for the student's annual review for the 2004-05 school year when the student would be in the fifth grade (Dist. Ex. 5 at pp. 1, 2). The CSE membership included the school psychologist who had conducted respondent's January 2003 psychological evaluation of the student, a special education teacher who had conducted respondent's December 2002 educational evaluation of the student, a school social worker employed by respondent, and an additional parent member (Dist. Ex. 5 at p. 2; Tr. pp. 9-10). Petitioner and the student's classroom teacher from MDS participated in the CSE meeting by telephone (Dist. Ex. 5 at p. 2). No regular education teacher participated in the CSE meeting (see Dist. Ex. 5 at p. 2; Tr. pp. 9-10).

Respondent's representative at the impartial hearing was also the school social worker at the February 2004 CSE meeting (Tr. p. 9). The representative testified that the CSE used the following information at its February 2004 meeting to complete the IEP: a progress report from the student's speech-language therapist who provided her with services at MDS; the classroom observation that the social worker had prepared when she observed the student in an October 2003 math class; information contributed from the student's current classroom teacher at MDS; information provided by petitioner; and the CSE's "knowledge of the student's functioning" (Tr. pp. 12-13; see also Dist. Exs. 1, 3). Petitioner's September/October 2002 private evaluation and respondent's December 2002 educational evaluation and January 2003 psychological evaluation were not reviewed by the CSE at its meeting (see Tr. pp. 12-13; see also Dist. Exs. 8, 9, 10). Respondent's representative testified that she had not seen respondent's evaluations and that parents generally received copies of the evaluations the year in which they were completed (Tr. pp. 11-12, 73-75).

The CSE recommended a special class placement in a community school with a student-to-teacher ratio of 12:1, speech-language therapy two times a week for 30 minutes in a group of three, and counseling once a week for 30 minutes in a group of three (Dist. Ex. 5 at p. 16). Testing accommodations included small group, special location and extended time of time and one-half (id.). Modified criteria for promotion included 50 percent proficiency based upon a fourth grade curriculum for English Language Arts (ELA) and 50 percent proficiency based upon a fifth grade curriculum for math (id.). The social worker also indicated that the IEP included updated functional descriptions and goals based on the information the CSE had (Tr. p. 13).

Respondent issued a Final Notice of Recommendation dated March 1, 2004 (Dist. Ex. 7; Tr. p. 87). Petitioner testified that within a month of her receipt of the notice of recommendation, she contacted the recommended school and made arrangements to visit (Tr. pp. 87-88, 98). Petitioner testified that she was taken to visit the 12:1 class to observe and was advised that the class did not have a permanent special education teacher. She further testified that a substitute teacher was providing services and that the teacher advised her that she was not a special education teacher and that they

"were in the middle of receiving a special [education] teacher" (Tr. pp. 89, 101-02).

For the 2004-05 school year at MDS, petitioner's daughter was placed in a mainstream fifth grade class with nine students and was provided with daily remediation periods, modified assignments, and modified tests (Tr. pp. 120-21, 147). MDS decided "to try" the student in the mainstream class (Tr. p. 147). This was based on a number of factors including: the student's desire to be with her same age peers; the student's need to be in the class because socially and emotionally she was "on par" with the other students; the small size of the class, the particular teacher in the class and how that teacher taught; and the educational support with which the school could provide the student for that class (see Tr. pp. 120, 121, 126, 131-32, 147).

The record reflects that by letter dated September 17, 2004, petitioner requested that an impartial hearing be scheduled (Parent Ex. A). Petitioner advised respondent that she had observed the recommended program and met with special education staff and that petitioner and her husband had concluded that the program was not appropriate for the student. Petitioner advised respondent that she and her husband had reenrolled their daughter in MDS' special education program and that they would be requesting reimbursement for tuition for the student's program in MDS (id.).

The impartial hearing commenced on June 28, 2005, continued on July 18, 2005 and concluded on September 8, 2005 (IHO Decision, p. 2). The impartial hearing officer rendered a decision on November 3, 2005 (IHO Decision, p. 11). The impartial hearing officer concluded that because petitioner's daughter never attended public school she was compelled to follow the decision of the United States District Court for the Southern District of New York in Bd. of Educ. v. Tom F., 2005 WL 22866 (S.D.N.Y. January 4, 2005) and find that petitioner was not entitled to tuition reimbursement (IHO Decision, pp. 5, 6). Additionally, the impartial hearing officer found that the CSE's recommendation was appropriate (IHO Decision, p. 10), concluded that the student's program at MDS was "not good" for her self-esteem, was inappropriate for her academically (IHO Decision, pp. 8, 9), and that petitioner never had any intention of sending her daughter to public school (IHO Decision, pp. 6, 8, 9).

Petitioner contends that the Tom F. decision does not preclude an award of tuition reimbursement; that a regular education teacher should have participated in respondent's February 2004 CSE meeting; and that the absence of such a CSE member compromised the development of an appropriate IEP for the student and deprived her of educational benefits, which resulted in a denial of a free appropriate public education (FAPE)[1]. Petitioner further contends that respondent's recommendation that the student be enrolled in special classes was not a placement in the least restrictive environment (LRE); that the student's fifth grade program at MDS was appropriate for her; and that equitable considerations supported an award of tuition reimbursement. Respondent contends that a regular education teacher was not a required member of the February 2004 CSE meeting, that the absence of such a member neither compromised the development of the student's IEP nor resulted in the loss of educational benefits to the student; and that the IEP recommended an appropriate educational program for petitioner's daughter in the LRE and provided her with a FAPE. Respondent also contends that petitioner did not show that the student's program at MDS was an appropriate private placement because it did not meet her academic needs. Respondent further contends that equitable considerations support a denial of an award of tuition reimbursement because the student has never attended a public school, that it was "doubtful" that petitioner "ever intended" to enroll her daughter in a public school and that petitioner's decision to place the student in a mainstream environment at MDS was based on "social considerations" not the student's academic needs.

I agree with petitioner that Tom F. is not binding precedent and that the IDEA does not preclude an award of tuition reimbursement here. The Tom F. decision held that section 1412(a)(10)(C)(ii) of the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400 - 1487)[2] must be construed to preclude tuition reimbursement for a unilateral placement "where a child has not previously received special education from a public agency" (Tom F., 2005 WL 22866, at *3). The District Court for the Southern District of New York has most recently noted that 20 U.S.C. § 1412(a)(10)(C)(ii) is ambiguous (see Carmel Cent. Sch. Dist. v. V.P., 373 F. Supp. 2d 402, 413-14 [S.D.N.Y. June 9, 2005]). Moreover, both the Tom F. and Carmel decisions noted that the Second Circuit Court of Appeals has not ruled on this issue (Tom F., 2005 WL 22866, at *3; Carmel, 373 F. Supp. 2d at 410). Under these circumstances, judicial precedent does not displace a conflicting construction on this issue (see Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Svcs., 125 S.Ct. 2688, 2700, – U.S. – (2005).

The statutory provision in question provides as follows:

> Reimbursement for private school placement. If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

(20 U.S.C. § 1412[a][10][C][ii]).

The official commentary to the federal regulations implementing this provision of the IDEA directs that:

> [H]earing officers and courts retain their authority, recognized in Burlington and Florence County School District Four v. Carter, 510 U.S. 7 (1993) (Carter), to award "appropriate" relief if a public agency has failed to provide FAPE, including reimbursement and compensatory services, under section 615(i)(2)(B)(iii) in instances in which the child has not yet received special education and related services. This authority is independent of their authority under section 612(a)(10)(C)(ii) to award reimbursement for private placements of children who previously were receiving special education and related services from a public agency.

(Placement of children by parent if FAPE is at issue, 34 C.F.R. § 300.403, 64 Fed. Reg. 12601 at 12602 [Mar. 12, 1999]; see also Letter to Luger, 33 IDELR 126 [OSEP 1999] ["We do not view § 612(a)(10)(C) as foreclosing categorically an award of reimbursement in a case in which a child has not yet been enrolled in special education and related services under the authority of the public agency. Reimbursement is an equitable remedy that courts and hearing officers may order in appropriate circumstances."])

State Review Officers have consistently declined to construe section 1412 of the IDEA as limiting the authority of an impartial hearing officer, review officer, or court under section 1415 of the IDEA to grant an award of tuition reimbursement to the parents of a child who has not previously

attended a public school, absent convincing evidence to the contrary of Congressional intent to do so (Application of the Dep't. of Educ., Appeal No. 05-074; Application of the Bd. of Educ., Appeal No. 05-027; Application of the Bd. of Educ., Appeal No. 05-015; Application of a Child with a Disability, Appeal No. 02-052; Application of a Child with a Disability, Appeal No. 00-012; Application of a Child with a Disability, Appeal No. 00-008; Application of a Child with a Disability, Appeal No. 99-35; Application of a Child with a Disability, Appeal No. 98-69; Application of a Child with a Disability, Appeal No. 98-54; Application of a Child with a Disability, Appeal No. 98-41; Application of a Child with a Disability, Appeal No. 98-25). Tom F., the court case that petitioner relies on is currently on appeal (see Freston v. Bd. of Educ., No. 05-0566 CV [2d Cir. Feb. 3, 2005]), and is not settled law at the time of this decision; therefore, I respectfully decline to follow it, pending its final resolution (see generally Application of a Child with a Disability, Appeal No. 01-052; Application of a Child with a Disability, Appeal No. 01-049; Application of a Child with a Disability, Appeal No. 01-044). Absent a final decision from a controlling court to the contrary, I continue to adhere to the State Review Officers' well-settled position and decline to construe section 1412(a)(10)(C)(ii) of the IDEA as limiting the authority of an impartial hearing officer, review officer, or court under section 1415 of the IDEA to grant an award of tuition reimbursement to the parent of a child who has not previously received special education or related services under the authority of the public school district in which the child resides. I note that the Eleventh Circuit Court of Appeals recently concluded that "sole reliance on the fact that [the student] never attended public school is legally insufficient to deny reimbursement under § 1412(a)(10)(C)(ii)" (C.M. v. School Bd. of Miami County, Fla., No. 04-14982, --- F.3d ---, 2006 WL 167993, *10 [11th Cir. Jan. 25, 2006]).

A purpose behind the IDEA is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]; Schaffer v. Weast, 126 S. Ct. 528 [2005]). A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a comprehensive written IEP (20 U.S.C. § 1401[8][D]; 34 C.F.R. § 300.13; see 20 U.S.C. § 1414[d]).[3] A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parent, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parent were appropriate, and equitable considerations support the parent's claim (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). In Burlington, the court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (id.). Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP" (Burlington, at 370-71; see Application of the Bd. of Educ., Appeal No. 05-073).

A FAPE is offered to a student, when the board of education (a) complied with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Bd. of Educ. v. Rowley, 458 U.S. 176, 206, 207 [1982]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). If a procedural violation has occurred, relief is warranted only if the violation affected the student's right to a FAPE (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 [2d Cir. 2000]). A denial of a FAPE occurs when procedural inadequacies either result in a loss of educational opportunity for the student, or seriously infringe on the parents' opportunity to participate in the IEP formulation process (see Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 [S.D.N.Y. 2005]; W.A. v. Pascarella, 153 F. Supp. 2d 144, 153 [D. Conn. 2001]; Briere v.

<u>Fair Haven Grade Sch. Dist.</u>, 948 F. Supp. 1242, 1255 [D. Vt. 1996]), or compromise the development of an appropriate IEP in a way that deprives the student of educational benefits under that IEP (see <u>Arlington Cent. Sch. Dist. v. D.K.</u>, 2002 WL 31521158 [S.D.N.Y. 2002]). In evaluating the substantive program developed by the CSE, the Second Circuit has observed that "'for an IEP to be reasonably calculated to enable the child to receive educational benefits, it must be likely to produce progress, not regression'" (<u>Weixel v. Bd. of Educ.</u>, 287 F.3d 138, 151 [2d Cir. 2002], quoting <u>M.S. v. Bd. of Educ.</u>, 231 F.3d 96, 103 [2d Cir. 1998][citation and internal quotation omitted]). This progress, however, must be meaningful; i.e., more than mere trivial advancement (<u>Walczak</u>, 142 F.3d at 130). The IDEA, however, does not require school districts to develop IEPs that maximize the potential of a student with a disability (<u>Rowley</u>, 458 U.S. at 197 n.21, 199; see <u>Grim v. Rhinebeck Cent. Sch. Dist.</u>, 346 F.3d at 379; <u>Walczak</u>, 142 F.3d at 132).

The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. § 300.550[b]; 8 NYCRR 200.6[a][1]). [S]pecial education and related services must be provided in the least restrictive setting consistent with a [student's] needs" (<u>Walczak v. Florida Union Free Sch. Dist.</u>, 142 F.3d 119, 122 [2d Cir. 1998]).

An appropriate educational program begins with an IEP which accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services (<u>Application of a Child with a Disability</u>, Appeal No. 04-046; <u>Application of a Child with a Disability</u>, Appeal No. 02-014; <u>Application of a Child with a Disability</u>, Appeal No. 01-095; <u>Application of a Child Suspected of Having a Disability</u>, Appeal No. 93-9). Federal regulation requires that an IEP include a statement of the student's present levels of educational performance, including a description of how the student's disability affects his or her progress in the general curriculum (34 C.F.R. § 300.347[a][1]; see also 8 NYCRR 200.4[d][2][i]). School districts may use a variety of assessment techniques such as criterion-referenced tests, standard achievement tests, diagnostic tests, other tests, or any combination thereof to determine the student's present levels of performance and areas of need (34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Question 1). An IEP must include measurable annual goals related to meeting the student's needs arising from his or her disability to enable the student to be involved in and progress in the general curriculum, and meeting the student's other educational needs arising from the disability (34 C.F.R. § 300.347[a][2]; see 8 NYCRR 200.4[d][2][iii]).

In addition, the IDEA and its implementing regulations require that the CSE include "at least one regular education teacher of such child (if the child is, or may be, participating in the regular education environment)" (20 U.S.C. § 1414[d][1][B][ii]; see 34 C.F.R. § 300.344[a][2]; see also 8 NYCRR 200.3[a][1][ii]). The regular education teacher member "shall, to the extent appropriate, participate in the development of the IEP of the child, including the determination of appropriate behavioral interventions and strategies and the determination of supplementary aids and services, program modifications, and support for school personnel" (20 U.S.C. § 1414[d][3][C]; see 34 C.F.R. § 300.346[d]; 8 NYCRR 200.3[d]). The regular education teacher must also "participate in discussions and decisions about how to modify the general curriculum in the regular classroom to ensure the child's involvement and progress in the general curriculum and participation in the regular education environment" (34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Section IV, Question 24), and participate in any review and revision of the IEP (20 U.S.C. § 1414[d][4][B]; 34 C.F.R. § 300.346[d]; 8 NYCRR 200.3[d]). In its official interpretation of the regulations, the United States Department of Education explains that the regular education teacher member "should be a teacher who is, or may be, responsible for implementing a portion of the IEP, so that the teacher can participate in discussions

about how best to teach the child" (34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Section IV, Question 26).

       The U.S. Department of Education has explained that the purpose behind the regular education teacher requirement is for that teacher to serve a critical role in providing input on modifications and supplementary aids and services that would allow the child to remain in the regular education environment to the maximum extent appropriate (Assistance to States for the Education of Children With Disabilities and the Early Intervention Program for Infants and Toddlers With Disabilities, 64 Fed Reg. 12591 [March 12, 1999]).  State Review Officers have found that although a board of education cannot always be expected to know who the student's regular education teacher will be prior to the CSE meeting, it should nevertheless have sufficient information about the student to designate a regular education teacher who is not only appropriately certified to teach the student, but who is also teaching in the subject matter or grade level in one of the programs which might be appropriate for the student (Application of the Bd. of Educ., Appeal No. 03-062; Application of a Child with a Disability, Appeal No. 02-100; Application of a Child with a Disability, Appeal No. 02-080; Application of the Bd. of Educ., Appeal No. 02-056; Application of a Child with a Disability, Appeal No. 00-060).

       In the instant case, petitioner's daughter was a student in a special class at MDS at the time of the February 2004 CSE meeting (Tr. p. 149) and the record does not indicate that her educational programming at MDS included participation with regular education students at that time.  At the time of the CSE meeting, therefore, the student was not participating in a regular education environment. However, the purpose of that CSE meeting was to discuss the student's placement for the next school year.  Under the circumstances here, this should have included consideration of whether petitioner's daughter could participate in the general education environment during the 2004-05 school year.  While the private psychoeducational evaluation which was conducted in September and October 2002 concluded that petitioner's daughter continued to require a special education setting, the psychologist who conducted that evaluation also recommended "(m)ainstreaming wherever possible" (Dist. Ex. 10 at p. 9).  In addition, the director of special education at MDS testified that at the time of the February 2004 CSE meeting, the student's special class teacher who participated in that meeting by telephone "wanted to try her in the mainstream" (Tr. pp. 132-33).  Further, in addressing whether the student's daughter would be able to participate in lunch, assemblies, trips and/or other school activities with non-disabled students, the IEP resulting from the February 2004 CSE meeting stated that "participation with non-disabled peers is appropriate at this time" (Dist. Ex. 5 at p. 16).  Therefore, I find that an appropriate regular education teacher was required to be a member of the February 9, 2004 CSE.

       The absence from the CSE meeting of a regular education teacher was not without harm.  The absence of an appropriate regular education teacher deprived the CSE of the ability to fully consider whether there were appropriate general education fifth grade classes in respondent's school that were appropriate for petitioner's daughter.  A regular education teacher would have been would have been able to contribute to a discussion of what supplementary aids and services, program modifications, curricular modifications, and school personnel support might have been put into place so that the student could benefit from access to general education classes.  Under these circumstances, I also find that the lack of an appropriate regular education teacher at the CSE meeting compromised the development of the student's IEP, deprived her of educational benefit and seriously infringed on petitioner's opportunity to participate in the IEP formation process.

       Respondent contends that the student's IEP was not compromised and educational benefits were not lost because "petitioner fully participated in the development of the student's IEP for the 2004-05

school year," as evidenced by the lack of expressed dissatisfaction by petitioner with the restrictiveness of the educational program recommended by respondent. Respondent also asserts that petitioner's September 2004 letter stating her disagreement with the CSE's recommendation only expressed dissatisfaction with the classroom she had observed and not with the program recommended by the CSE. Respondent further asserts that petitioner did not provide respondent with the ability to offer the student a 12:1 special class in another school because she did not advise respondent of her dissatisfaction with the proposed school until after she placed the student at MDS for the 2004-05 school year.

These contentions are not persuasive. The record provides limited information with respect to what transpired at the February 2004 CSE meeting and petitioner's level of participation. With respect to respondent's second point, there is inadequate information in the record. I am unable to determine from the information presented whether or not, at that meeting, petitioner stated or conveyed any disagreement or concern to the CSE regarding its recommendations for the 2004-05 school year. Further, respondent incorrectly states that the disagreement set forth in petitioner's September 2004 letter was limited to the particular class that she observed. However, that letter specifically stated that the student needed one-to-one assistance during the school day, which was not recommended by the CSE, and also that petitioner and her husband had concluded that "the program" which was recommended was not appropriate for their daughter (see Parent Ex. A). Finally, I am unable to consider respondent's argument that the petitioner did not provide respondent with the ability to offer the student a different class because she did not advise respondent of her dissatisfaction with the proposed school until after she had placed the student at MDS for the 2004-05 school year. Finally, petitioner did not make the argument at the hearing that they were constrained from offering a revised IEP due to an alleged untimely notice of dissatisfaction from the parent; I find that this issue is beyond the scope of my review because it was not raised below (Application of a Child with a Disability, Appeal No. 05-080; Application of a Child with a Disability, Appeal No. 04-043; Application of a Child with a Disability, Appeal No. 04-019; Application of the Bd. of Educ., Appeal No. 02-024).

Even if the CSE had been properly constituted, the record demonstrates that the student's 2004-05 IEP was substantively inadequate. A CSE must have adequate and timely evaluative data to prepare an appropriate IEP for a child (Application of a Child with a Disability, Appeal No. 05-087; Application of a Child with a Disability, Appeal No. 05-025; Application of the Bd. of Educ., Appeal No. 99-94; Application of a Child with a Disability, Appeal No. 99-05; see Application of a Child with a Handicapping Condition, Appeal No. 91-25). The IEP developed at an annual review is to be based upon "review of the student's IEP and other current information pertaining to the student's performance" and that annual review is to consider, among other things, the initial or most recent evaluation of the student (8 NYCRR 200.4[f][1]). In this case, the CSE did not review the student's most recent educational and psychological evaluations or the detailed and comprehensive private neuropsychological evaluation that had been prepared and submitted to respondent contemporaneously with those other evaluations (see Tr. pp. 12-13; see also Dist. Exs. 8, 9, 10). Furthermore, the record does not show that the CSE considered information regarding the student's cognitive ability.

Moreover, a board of education must assess a student in all areas related to a suspected disability, and the evaluation must be sufficiently comprehensive to identify all of the student's special education needs (8 NYCRR 200.4[b][6][vii] and [ix]). The evaluative information must be sufficient to ascertain the physical, mental, behavioral, and emotional factors which contribute to the suspected disabilities (8 NYCRR 200.4[b][1][v]), and it should provide information related to enabling the student to participate and progress in the general education curriculum (8 NYCRR 200.4[b][1]). A

CSE may direct that additional evaluations or assessments be conducted to appropriately assess the student in all areas related to the suspected disabilities (8 NYCRR 200.4[b][3]). Importantly, without an appropriate evaluation of a student's special education needs, it is not possible to formulate an IEP to address those needs by providing the individually designed instruction and services necessary for the student to receive educational benefit.

I have reviewed the evaluative information regarding petitioner's daughter considered by the CSE at the time of the February 2004 CSE meeting. I find that such information was not adequate to support the CSE's recommendation for the 2004-05 school year. The record indicates that the student has auditory processing difficulties and that, if spoken to, her response time is delayed (Dist. Ex. 10 at p. 2; Tr. p. 106). The February 2004 IEP indicates that the student experiences difficulty with receptive, expressive, pragmatic and attending abilities (Dist. Ex. 5). When attending to auditory material she fatigues easily (Dist. Ex. 5 at p. 4). Observation of the student in the classroom setting suggests that she has difficulty attending to directions in a noisy environment (id.). In addition, the IEP notes that the student lacks confidence in her abilities and needs verbal support from teachers (Dist. Ex. 5 at p. 5).

However, the CSE did not recommend an auditory processing evaluation despite information suggesting that such an evaluation would be appropriate. Such an evaluation would provide specific information regarding how the student processes verbally presented information in a noisy environment where it is necessary to filter out the message from the noise. An appropriate evaluation would also include suggestions to assist teachers and the parent in presenting information to the student in a way that she could process the information with greater efficiency and accuracy. This evaluation would also be expected to provide the teachers, petitioner, and the student insight into why the student may not be responding as expected; how the curriculum might be modified; how the environment might be accommodated and supported to assist the student to process and comprehend verbal directions and information across an array of school situations, both academically and socially, and to maximize the extent to which the student would be able to take advantage of, and participate in, the regular education environment. Accommodations and supports considered by the evaluation would include, but not necessarily be limited to, preferential seating or clarification of directions, assistive technology such as an FM auditory trainer, and access to a computer and use of computer software.

Additionally, petitioner's testimony indicates that the student has difficulties copying from the board and working on her own, especially in math; in writing reports; and in answering questions on a test (Tr. pp. 91, 103). The private psychoeducational evaluation conducted in September and October 2002 indicates that the student also has a visual-perceptual-motor deficit (see Dist. Ex. 10 at p. 9), particularly in complex tasks that involve a motor component (see Dist. Ex. 10 at p. 5). Notwithstanding this, the CSE did not recommend an occupational therapy evaluation. Such an evaluation would provide insight into the student's functional visual perceptual skills and would indicate whether occupational therapy would be able to address the student's visual perceptual needs. An appropriate occupational therapy evaluation would also address the ways in which the educational environment could be accommodated to present visual information to the student so that she could make better progress in tasks such as copying from the board.

I find that the CSE did not adequately evaluate petitioner's daughter. I further find that the CSE recommended an educational program for the student without first considering the required evaluative information (Application of a Child with a Disability, Appeal No. 05-087).

The IDEA mandates that all students with disabilities be educated with nondisabled children to

the maximum extent appropriate and may only be placed in a more restrictive environment when the nature and severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. § 300.550[b][2]; Oberti v. Bd. of Educ., 995 F.2d 1204, 1213 [3d Cir. 1993]; Briggs v. Bd. of Educ., 882 F.2d 688, 691 [2d Cir. 1989]; Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1044 [5th Cir. 1989]; Warton v. Bd. of Educ., 217 F. Supp.2d 261, 273 n.1 [D. Conn. 2002]; A.S. v. Norwalk Bd. of Educ., 183 F. Supp.2d 534, 538 n.3 [D. Conn. 2002]; Mavis v. Sobol, 839 F. Supp. 968, 982 n.25 [N.D.N.Y. 1994]; Application of a Child with a Disability, Appeal No. 03-009; Application of a Child with a Disability, Appeal No. 03-024; Application of a Child with a Disability, Appeal No. 00-093; Application of a Child with a Disability, Appeal No. 94-21). "[S]pecial education and related services must be provided in the least restrictive setting consistent with a [student's] needs" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 [2d Cir. 1998). The exposure of students with disabilities to their nondisabled peers is an important aspect of his or her educational and social development (see Oberti v. Bd. of Educ., 995 F.2d 1204, 1216 [3d Cir. 1993]; Daniel RR. v. Bd. of Educ., 874 F.2d 1036, 1049 [5th Cir. 1989]; Mavis v. Sobol, 839 F.Supp. 968, 990 [N.D.N.Y. 1993]).

As indicated above, the student's private psychoeducational evaluation recommended mainstreaming "wherever possible" (Dist. Ex. 10 at p. 9). The clinical psychologist who conducted that evaluation also advised that petitioner's daughter "should be encouraged to pursue activities in the areas of her strength (sports) and to have as many positive social experiences as possible" (id.). Moreover, in responding to whether the student was able to participate in school activities, the IEP indicated that the student's "participation with non-disabled peers is appropriate at this time" (see Dist. Ex. 5 at p. 16). I also note that MDS' director of special education testified that at the time of the CSE meeting, the student's special class teacher "wanted to try (the student) in the mainstream" (Tr. pp. 132-33). The program recommended by respondent's CSE included no classroom mainstreaming opportunities and a special class environment was recommended for "all" areas of instruction (Dist. Ex. 5 at p. 14). This included educational instruction in computer, physical education and art, where such instruction was to be provided to the student as part of her special education classroom group. (see Tr. pp. 32, 33, 34-35, 35-36). I find that the program recommended for petitioner's daughter was unduly restrictive and not a program in the LRE. In particular, I find that respondent should have afforded mainstreaming opportunities for petitioner's daughter.

Accordingly, and based on all of the above, I find that respondent has not offered petitioner's daughter a FAPE in the LRE for the 2004-05 school year. Petitioner, therefore, has prevailed with respect to the first Burlington criterion for an award of tuition reimbursement.

Having determined that the record does not demonstrate that the student was offered a FAPE for the 2004-05 school year, I must now consider whether petitioner has met her burden of demonstrating that the placement selected for the student for that school year was appropriate (Burlington, 471 U.S. 359; Application of the Bd. of Educ., Appeal No. 03-062; Application of a Child with a Disability, Appeal No. 02-080). The private school placement must be "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., the private school offered an educational program which met the child's special education needs (Application of a Child with a Disability, Appeal No. 04-108; Application of a Child with a Disability, Appeal No. 01-010). The private school need not employ certified special education teachers or have its own IEP for the student (Carter, 510 U.S. 7; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-105).

I find that MDS appropriately addressed the student's identified needs in a mainstream environment during the 2004-05 school year. MDS is a private school with a total enrollment of 460 students (Tr. p. 120). The school offers special education to students with learning and language disabilities and provides such students with self-contained special education classes and a mainstreaming and inclusion program with remediation (Tr. p. 119). Its special education students are assigned to the school's special education programs according to their needs (see Tr. p. 119).

Petitioner's daughter attended a fifth grade mainstream class at MDS during the 2004-05 school year and also received daily one-to-one support for an hour a day, sometimes more (Tr. pp. 121, 140, 164-65, 166-67). Respondent also provided the student with speech-language therapy at the school through a related services authorization (Tr. p. 12; see also Dist. Ex. 3). The student's class consisted of nine students (Tr. p. 121). The other students in the class were general education students and were typically developing fifth graders (Tr. p. 154). Importantly, the director of special education at MDS testified that the mainstream class was preferable to a self-contained special education class for the student because it gave her the social and emotional support that she needed and the ability to learn and be comfortable in her learning environment (Tr. pp. 131-32). The teacher who provided the student with daily one-to-one services also testified that placement in a special education class would have been detrimental to the student because of her social needs (Tr. pp. 174-75; see also Tr. pp. 130, 144).

The director of special education at MDS testified that the student was mainstreamed throughout the day so that she would not have too many changes within the day (Tr. p. 121). As part of its support, MDS provided the student with daily remediation periods on a pullout basis, scheduled to support the student on a one-to-one basis throughout the school year (Tr. pp. 122, 128, 140). Assignments and tests were modified throughout the school year (Tr. p. 121). The teacher who provided the student's one-to-one support was "in constant contact with the teachers in the classroom" to get the content material and the lesson plans (Tr. pp. 122, 133). The purpose of the one-to-one teacher was to offer daily support to the student by working with her, including helping with her math and English skills, homework, and organizational needs; observing in the classroom; pre-teaching material to the student; modifying assignments; and assisting the student with any assignments in the form of guidance in developing study skills and learning skills (see Tr. pp. 122, 133, 155-56, 164-65). MDS also provided the student with testing modifications including a word bank and untimed tests (Tr. pp. 127, 158). Because of her difficulty with reading, "guiding questions" were also used as a way to modify assignments and tests and this kind of support was also provided for math (Tr. p. 127). The student's classroom teacher also repeated directions and "automatically" provided the student with individualized modifications (Tr. pp. 141, 142).

The student's mainstream teacher testified that because the student's greatest difficulty was in reading and because she read at a "lower level" than the other students, her reading assignments were modified so that she was required to read fewer books than the rest of the class (Tr. p. 156). In addition, when doing a book report, the student would read books on a lower reading level than her classmates would and she had someone help her to make sure she understood the book. She testified that when the student had someone working with her and helping with her assignments, she did "wonderful" work.

Both the mainstream teacher and the teacher who provided the student with one-to-one support indicated that the student's mainstream class at MDS was the appropriate placement for the student for the 2004-05 school year when considering her social needs and that she benefited from it (Tr. pp. 131, 158-160, 170-71). They pointed out that the class was small; that the student was able to get personal

attention; and that she was able to attend class with the same students with whom she was friendly, with whom she fit in, and with whom she participated in after-school activities, including basketball (Tr. pp. 160, 171, 173).

While I find that the private placement was appropriate to meet the student's needs at the time the placement decision was made, I note that, while not necessarily dispositive of the appropriateness of the placement, the director of special education at MDS testified that the student made progress academically, socially and emotionally in the assigned mainstream class (Tr. p. 131; see also Tr. pp. 139, 142, 143). The student's confidence and self-esteem improved (Tr. pp. 158, 173). During the 2004-05 school year, her report card shows that the student received A's and B's in all academic areas, except for reading comprehension, which was consistently in the C range, and which was an area that remained difficult for her (Parent Ex. D at pp. 2, 3). The narrative to that report card noted her "extra effort," her desire to achieve and the success she had achieved, that she came to class prepared and ready to learn, that she had learned a lot during the year, that she had improved her focusing in class and on the task at hand (see Parent Ex. D at p. 3). The narrative indicated that she had "shown incredible improvement" in spelling and vocabulary; that in writing she continued to work on organizing her thoughts into clear, organized paragraphs; that she had improved in her ability to write essays, and that she did "a great job" with group projects; and completed a "quite impressive" creative writing project (id.). The narrative also pointed to areas requiring additional work including her difficulty and lack of confidence in reading and the need that she continue work on proper introductions and adding more detail to her writing (id.). The mainstream teacher testified that the student had improved in her writing and did very well on her book reports (Tr. p. 160). While the student needed someone to help her organize and make sure she was "on track," she indicated that the student very much enjoyed creative projects that let her use her art skills and creative abilities (id.).

The teacher who provided the student with daily one-to-one support services testified that the student had "definitely" made progress in the program at MDS (Tr. p. 170). She described the student's progress as "slow, but steady," (Tr. p. 167) and believed that the services she provided were an essential ingredient to that progress (see Tr. p. 170). She testified that in math, the student made progress in number computation, however, word problems were required to be broken down into manageable steps in order to meet the student's needs (Tr. pp. 167-68). She also indicated that student realized that she found things difficult and "was not that confident," but that the student sought help when needed (Tr. pp. 166-67).

The impartial hearing officer concluded "that the general education classroom was too difficult" for the student and based that on the fact that the daily one-to-one support the student received at MDS was an important element in the student's success in her mainstream classroom (IHO Decision, pp. 6-7). The impartial hearing officer also concluded that the student was placed in the MDS mainstream class for "social reasons" only. She further concluded that the student required a full-time special education teacher to help her to learn at her own pace and that the mainstream MDS classroom was inappropriate for her academically (IHO Decision, pp. 6-10).

I find that MDS provided the student with an appropriate placement and that the student's program during the 2004-05 school year addressed the student's special education needs. The fact that the daily one-to-one support services, testing, program, and teaching modifications were important components of the MDS' mainstream educational program does not make the student's placement in that mainstream class inappropriate.

I do not agree with the impartial hearing officer's conclusion that the student's placement was based on "social reasons" alone. While such factors may have provided the impetus for the school to consider whether the student could be placed in a mainstream class (see Tr. p. 126), the school's decision to place the student in the mainstream class was based on a conclusion that the student should be able to receive educational as well as social benefit from the placement (Tr. pp. 126, 131, 134-35, 147).

Accordingly, based upon my review of the hearing record, I find that petitioner has prevailed with respect to the second Burlington criterion for an award of tuition reimbursement for her daughter's attendance at MDS for the 2004-05 school year.

The final criterion for an award of tuition reimbursement is that the parent's claim be supported by equitable considerations. Equitable considerations are relevant to fashioning relief under the IDEA (Burlington, 471 U.S. at 374; Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68 [2d Cir. 2000]); see Carter, 510 U.S. at 16 ["Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required"]. Such considerations "include the parties' compliance or noncompliance with state and federal regulations pending review, the reasonableness of the parties' positions, and like matters" (Wolfe v. Taconic Hills Cent. Sch. Dist., 167 F. Supp. 2d 530, 533 [N.D.N.Y. 2001], citing Town of Burlington v. Dep't of Educ., 736 F.2d at 773, 801-02 [1st Cir. 1984], aff'd, 471 U.S. 359 [1985]). In the absence of evidence demonstrating that the parents failed to cooperate in the development of the IEP or otherwise engaged in conduct that precluded the development of an appropriate IEP, equitable considerations generally support a claim of tuition reimbursement (Application of the Bd. of Educ., Appeal No. 05-030; Application of the Bd. of Educ., Appeal No. 04-091; Application of a Child with a Disability, Appeal No. 04-049).

The record does not show that petitioner failed to cooperate in the development of her daughter's IEP or otherwise engaged in conduct that precluded the development of an appropriate IEP. Petitioner attended the February 2004 CSE meeting by telephone (Tr. pp. 13, 86; Dist. Ex. 5 at p. 2). Further, when she received respondent's formal notice of recommendation, she made arrangements to visit the recommended program (Tr. pp. 87-88; see also Dist. Ex. 7). At the time of her visit, the recommended class did not have a permanently assigned special education teacher and was receiving instruction from a substitute teacher who was not a special education teacher (Tr. pp. 89, 90, 94-95). Petitioner testified about her visit, her observations and her concerns (Tr. pp. 88-90, 94-95, 98-99, 101-103). Petitioner and her husband reenrolled their daughter at MDS and advised respondent of this by letter dated September 17, 2004 (Tr. pp. 82, 90; Parent Ex. A). I note that the record has not been developed with respect to the number and type of communication(s) petitioner may have had with respondent relative to her dissatisfaction with the program recommended by respondent's CSE.

Respondent contends that the equities do not support an award of tuition reimbursement and asserts that it was "doubtful" that petitioner "ever intended" to enroll her daughter in a public school and that it was "reasonable to assume" that she did not want to do so for the 2004-05 school year.

I find that the record does not support such a conclusion. The record does not demonstrate petitioner's intentions and what petitioner would have done had respondent offered her daughter a FAPE. Moreover, the impartial hearing officer's conclusion that petitioner would never have sent her daughter to a public school is based in significant part on the fact that petitioner's other children, who do not have disabilities, have not attended public school (see IHO Decision, p. 6). Further, the fact that petitioner's nondisabled children have not attended public school does not mean that petitioner did not

have any intention of enrolling her daughter who did have a disability and was, therefore, in need of special services in an appropriate educational program provided by respondent.

Based upon my review of the record, petitioner's appeal must be sustained[3].

**THE APPEAL IS SUSTAINED.**

      **IT IS ORDERED** that the impartial hearing officer's decision is hereby annulled; and

      **IT IS FURTHER ORDERED**, unless the parties otherwise agree, that within 60 days of the date of the decision respondent's CSE shall obtain an auditory processing evaluation and an occupational therapy evaluation of the student and consider the results of the evaluations; and

      **IT IS FURTHER ORDERED** that respondent shall reimburse petitioner for the cost of her daughter's tuition at the Manhattan Day School for the 2004-05 school year, upon petitioner's submission to respondent of proof of such payment.

**Dated:**        **Albany, New York**
                **March 1, 2006**                _____
                                                     **PAUL F. KELLY**
                                                     **STATE REVIEW OFFICER**

---

[1] The term "free appropriate public education" means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meets the stands of the State educational agency;
(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and,
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.
20 U.S.C. § 1401(8) (see 34 C.F.R. § 300.13; 20 U.S.C. § 1414[d]).

[2] On December 3, 2004, Congress amended the IDEA, however, the amendments did not take effect until July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004 [IDEIA], Pub. L. No. 108-446, 118 Stat. 2647). Citations contained in this decision are to the statute as it existed prior to the 2004 amendments. The relevant events in the instant appeal took place prior to the effective date of the 2004 amendments to the IDEA, therefore, the provisions of the IDEIA do not apply.

[3] This determination would remain if during the administrative hearing the burden had been placed on the parents, the parties challenging the IEP, as the Supreme Court recently established in Schaffer v. Weast, 126 S. Ct. 528, 537 (2005) (see Application of the Bd. of Educ., Appeal No 05-120).